**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 09-cv-02293-MSK-MJW

A-W LAND CO., LLC;
VERNON JESSER;
MARY JESSER;
KENT J. McDANIEL;
DEANNA R. McDANIEL;
MARVIN BAY; and
MILDRED BAY, Co-Trustees of the Bay Family Trust, individually and on behalf of all
others similarly situated,

      Plaintiffs,

v.

ANADARKO E&P COMPANY LP f/k/a RME PETROLEUM COMPANY; and
ANADARKO LAND CORPORATION f/k/a RME LAND CORP.,

      Defendants.

_____

**OPINION AND ORDER GRANTING, IN PART, MOTION FOR RECONSIDERATION**
**BUT DENYING MODIFICATION OF PRIOR ORDER**
_____

**THIS MATTER** comes before the Court in an unusual procedural posture. In 2012, this

Court certified a class for purposes of addressing the Plaintiffs' claims for declaratory relief,

identifying at least four potential questions of law that were common to all class members. At a

Scheduling Conference (# 135) in 2013, the Magistrate Judge directed that the parties "file

comprehensive simultaneous opening briefs" (and, subsequently, response briefs) addressing

these legal issues. The parties filed the opening briefs (# 142, 159) and response briefs (# 165,

170) (as well as several thousand pages of supporting exhibits) as directed. However, because

the briefing was unconnected to any sort of motion by any party, it has remained unclear to the

1

undersigned what function the Magistrate Judge intended the briefing to serve or what relief was being sought by the parties through the briefing.

Because the analysis, standard of review, and burden of proof to be applied to this matter differs depending on how the matter is classified, it is ow necessary for the Court to attempt to identify the issue as to which the parties seek relief.  Both sides have submitted evidentiary material in conjunction with their briefs, suggesting that the Court should treat the matter as a request for summary judgment.  The Defendants (collectively, "Anadarko") initial brief requests that the Court "enter judgment for Anadarko on all claims herein"; the Plaintiffs' initial brief does not request any specific relief, but makes passing reference to a "jury's interpretation" of the terms of the contractual terms at issue here.  *See* Docket # 157 at 24-25.  Under these circumstances, the Court deems it appropriate to treat the matter as a motion for summary judgment filed by Anadarko, seeking summary judgment in its favor pursuant to Fed. R. Civ. P. 56.

## FACTS

The Court will briefly summarize the pertinent facts here and elaborate as necessary in its analysis.

In the 1860s, as part of building a transcontinental railroad, Congress chartered the Union Pacific Railroad Company and granted to it large portions of then-federally owned land on either side of the planned route between Nebraska and Utah.  Around the turn of the century, with the railroad completed, Union Pacific began selling some of these lands to farmers, ranchers, loggers, and homesteaders.  Typically, Union Pacific's deeds conveyed only the surface estate to buyers and it retained rights to the mineral estate beneath the lands.  The deeds given by Union

Pacific typically contained a variation on the following language (hereinafter referred to as "the surface reservation"):

> Excepting and reserving to said Union Pacific Railroad Company, its successors, and assigns:
>
> First, all [oil,][1] coal, and other minerals within or underlying said lands.
>
> Second, the exclusive right to prospect in and upon said land for [oil,] coal, and other minerals therein . . . . [and]
>
> Third, the right of ingress, egress, and regress upon said land to prospect for, mine and remove any and all such [oil,] coal or other minerals, and the right to use so much of said land as may be convenient or necessary for the right-of-way to and from such prospect places or mines, and for the convenient and proper operation of such prospect places, mines, and for roads and approaches thereto or for removal therefrom of [oil,] coal, mineral, machinery, or other material.

When Union Pacific then sought to exploit the reserved mineral rights, it typically negotiated a "Surface Owner's Agreement" ("SOA") with the owner of the surface estate.  The SOAs customarily acknowledged Union Pacific's ownership of the underlying minerals (including oil) and confirmed Union Pacific's right of access across the surface estate in order to remove the minerals or oil.  In consideration for the surface owner entering into the SOA, Union Pacific typically offered the surface owner a royalty payment, usually 2.5% of the value of the minerals extracted.

In or about 2000, Anadarko acquired Union Pacific' mineral interests with regard to the lands in question in this lawsuit.  Anadarko, however, discontinued the practice of entering into a

---

[1]     Some sample deeds in the record contain an underscored blank space at this location in the form deed.  Other samples in the record have the word "oil" handwritten in that space. Because it is undisputed that Colorado law deems a deed's reference to "other minerals" to include oil and gas, *McCormick v. Union Pacific Resources Co.*, 14 P.3d 346, 348 (Colo. 2000), the Court treats all of the deeds in question as encompassing oil and gas reserves found within the mineral estates.

SOA with surface owners, and concomitantly, the practice of paying royalties to surface owners. Anadarko's decision to forgo SOAs allowed it avoid payment of royalties to surface owners, but it deprived Anadarko of the peace and freedom from litigation that royalty payments secured.  As a result, the Plaintiffs commenced this suit.   They allege that Anadarko's (and its lessees') use of the surface of the Plaintiffs' land in order to access the subsurface minerals exceeds the scope of the surface reservations found in the underlying deeds.  Thus, they contend such access constitutes trespass.[2]

Upon the Plaintiffs' motion for certification of a class action, this Court determined (# 120) that the claims of all devisees of the Union Pacific lands presented certain common questions of law, including: (i) how the terms of the surface reservation in the Union Pacific deeds should be interpreted; (ii) whether Anadarko itself can be held liable for any trespasses on the Plaintiffs' land committed by its lessees; and (iii) whether permits issued by the Colorado Oil and Gas Conservation Commission ("COGCC") operate to license conduct by Anadarko or its lessees that might otherwise be in violation of the terms of the surface reservation.  Thus, the Court certified a class action for the limited purpose of addressing any issues of law that were common to the entire class of Union Pacific devisees.  However, the Court also found that the question of whether Anadarko's (or its lessees') conduct on any given Plaintiff's land constituted a trespass was a matter calling for individual factual determination.  As to that question,  class-based litigation was no longer appropriate. Accordingly, the Court directed that, once any questions of law common to the entire class were resolved, the class would be de-certified and each Plaintiff would have to proceed to try their own trespass claims individually.

---

[2]     More specifically, the Plaintiffs contend that the effect of surface reservation requires Anadarko to engage in directional (*i.e.* slanted) drilling via wells radiating from a single well site, rather than through the drilling of numerous vertical wells, each from their own site.

At the Scheduling Conference on October 28, 2013, the Magistrate Judge directed that the parties "file comprehensive, simultaneous opening [and response] briefs" addressing the four specific common questions of law identified in this Court's class certification order. The parties did so.[3]  As noted above, this briefing was not coupled to any particular motion or other request for relief by any party, making it somewhat unclear how that briefing should be treated. For the reasons set forth above, this Court elects to treat the briefing as constituting a motion by Anadarko for summary judgment in its favor and the Court proceeds to adjudicate the issues raised in the briefing in that context.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

---

[3]      Anadarko briefly raised a fifth issue: whether class members who had entered into SOAs with Union Pacific or Anadarko had effectively released any claims they might have by the terms of the SOA. Because this is a question of individual, not class-wide, legal significance, the Court declines to consider it at this stage. To the extent that such a class member later pursues in individual suit against Anadarko, Anadarko may raise its release argument at that time.

for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P.

56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine

dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material

fact, no trial is required. The court then applies the law to the undisputed facts and enters

judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

claim or defense, a trial is required. If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of

law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### A. Interpreting the surface reservation

The central dispute between the parties concerns the meaning of the terms used by Union

Pacific in the surface reservation found in each of the deeds in question.

6

Courts interpret the conveyancing contained in deeds using the same tools and techniques they use in construing any written instrument.  In other words, the court strives to ascertain the parties' intent, and ordinarily attempts to do so from the four corners of the instrument, considering the entirety of the deed and not just isolated sentences and clauses.  *Notch Mountain Corp. v. Elliott*, 898 P.2d 550, 557 (Colo. 1995).  If none of the other common tools of construction yield a meaningful result, the court may resort to the ultimate canon of construction: resolving ambiguities against the drafter.  *Id.*

Once again, the version presented by both sides for interpretation reserves to the mineral interest holder:

> . . . the right of ingress, egress, and regress upon said land to prospect for, mine and remove any and all such [oil,] coal or other minerals, and **the right to use so much of said land as may be convenient or necessary** for the right-of-way to and from such prospect places or mines, and for the convenient and proper operation of such prospect places, mines, and for roads and approaches thereto or for removal therefrom of [oil,] coal, mineral, machinery, or other material.  (Emphasis added)

Careful examination of the quoted text reveals that two separate provisions are contained therein. First, the mineral interest holder has a general "right[ ] of ingress, egress, and regress" over the surface lands -- that is, the ability to enter the land, exit the land, and return back to the land -- for purposes of "prospect[ing] for, min[ing] and remov[ing]" any minerals thereunder.  Second, the mineral interest holder has the right to use "such land as may be convenient or necessary" to achieve several purposes -  to establish rights of way to mining locations, to operate (in a "convenient and proper" manner[4]) mines and prospect sites, to lay roads, and to install other means of removing minerals and equipment.

---

[4]      Although similar in structure to the "convenient and necessary" restriction, it is clear that the phrase "convenient and proper" modifies the verb "operation [of mines]" not the verb "to use

Before the Court can turn to the interpretation of the key phrase underlying the parties' dispute – the right of the mineral owner to make "convenient or necessary" use of the surface land -- the Court must first consider Colorado's existing common law governing split estates in real property.[5]  In *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 927 (Colo. 1997), the Colorado Supreme Court explained that "a mineral rights holder is legally privileged to make such use of the surface as is reasonable and necessary to develop underlying minerals." Notably, the right of the mineral estate owner to use the surface estate often stands in tension with the rights of the surface owner.  Colorado law expects that "mineral rights holders [will] accommodate surface owners to the fullest extent possible consistent with their right to develop the mineral estate."  *Id.* at 927.  The form that such accommodation will take necessarily varies with the circumstances, "depending on surface uses and on the alternatives available to the mineral rights holder for exploitation of the underlying mineral estate."  *Id.*  But a trespass would

---

[land]."  The Court does not understand the Plaintiffs to be alleging that the methods by which Anadarko operates its mines/wells are "improper" according to accepted industry practices. Thus, the only limitation on Anadarko's use of the surface land is that it must be "convenient or necessary" to accomplish the tasks listed in the remainder of the reservation.

[5]      In *Radke v. Union Pacific R.R. Co.,* 334 P.2d 1077, 1087 (Colo. 1959), the Colorado Supreme Court determined that the surface reservation used by Union Pacific here does not constitute a splitting of the mineral and surface estates and retention by Union Pacific of the mineral estate.  Rather, it held that the terms of the deed convey the entire property – surface and minerals – to the buyer in fee simple, subject only to Union Pacific's reservation of a license to occupy the surface for the removal of minerals.

Neither party here has argued that the holding of *Radke* or the status of Union Pacific as a licensee rather than owner of the mineral estate affects the analysis to be applied.  The same logic that grants the holder of a mineral estate the inherent right to make reasonable use of the surface estate in removing those minerals would grant that same inherent right to the holder of a license to remove such minerals.  Thus, this opinion may sacrifice accuracy for convenience and describe Union Pacific (and later Anadarko) as being "owners" of a "mineral estate" or the minerals themselves, rather than as licensees entitled to exploit a mineral estate that is technically owned by the surface owner.

occur if the mineral estate holder's activities "preclude or impair uses by the surface owner . . . when reasonable alternatives are available to the [mineral estate holder]." *Id.*

*Gerrity* expressly sets forth the allocation of proof on a claim of trespass under Colorado common law. To prove a trespass by a mineral estate owner, the owner of the surface estate must first establish a *prima facie* case by "present[ing] evidence that the [mineral estate owner's] conduct materially interfered with surface uses." *Id.* at 933. Such material interference is "interference which is not reasonable from the perspective of the surface owner and considering only the impact on the surface use." *Id.* If the surface owner carries that minimal burden, the owner of the mineral estate must "present evidence, by means of expert testimony or otherwise, that explains why its surface conduct was reasonable and necessary from the perspective of the [mineral estate holder]." *Id.* The owner of the mineral estate may carry this burden by, for example, "explain[ing] the necessity of its conduct and . . . present[ing] evidence that its operations conformed to standard customs and practices in the industry." *Id.* The surface owner may respond with rebuttal evidence "that reasonable alternatives were available to the operator at the time of the alleged trespass." *Id.* "Ultimately," *Gerrity* explains, "it is the province of the trier of fact to balance the competing interests of the [mineral estate holder] and surface owner and objectively determine whether, under the circumstances, the [mineral holder's] surface use was both reasonable and necessary." *Id.* at 933-34.

Although *Gerrity* is of fairly modern provenance, the principles it recites are not novel or even of particularly recent invention. *Gerrity*'s cited authority for the proposition that mineral estates necessarily entail a right to make reasonable use of the surface estate dates at least back to 1961, citing *Rocky Mountain Fuel Co. v. Heflin*, 366 P.2d 577, 580 (Colo. 1961). *Heflin*, in turn, relies on cases such as *Jilek v. Chicago, Wilmington & Franklin Coal Co.*, 47 N.E.2d 96, 98 (Ill.

1943), that date back another two decades, and *Jilek*, in turn, relies upon authority for that conclusion that dates back even before Union Pacific was issuing the deeds in question. *Citing e.g. Williams v. Gibson*, 4 So. 350, 352-53 (Ala. 1888) (mineral owner "may occupy so much of the surface, adopt such machinery and modes of mining, and establish such auxiliary appliances and instrumentalities, as are ordinarily used in such business, and may be reasonably necessary for the profitable and beneficial enjoyment of his property") *and Ingle v. Bottoms*, 66 N.E.160, 162 (In. 1903) ("the grant of the right to the coal carries with it as a necessary incident the right not only to penetrate the surface of the soil for the coal, but also to use such means and processes for mining and removing the same from the premises as may be reasonably necessary. This includes the right to construct such roads and railroad tracks on the surface of the land as are reasonably necessary for the transportation of supplies, machinery for the operation of the mine, and for removing the coal from the mine openings").  Thus, although *Gerrity* itself long post-dates the drafting of the surface reservation, the Court assumes that, at the time Union Pacific was issuing the deeds in question, it was nevertheless aware that its retention of a mineral interest also granted it the inherent right to make reasonable and necessary use of the surface estate.[6]

　　　With this context in mind, the Court turns to the specific language of the Union Pacific deeds.  As noted above, the deeds reserve to the mineral interest owner (Union Pacific and its lessees and assigns): (i) a general "right[ ] of ingress, egress, and regress" on the surface lands for purposes of "prospect[ing] for, min[ing] and remov[ing]" any minerals thereunder, and (ii) the right to use "such land as may be convenient or necessary" to establishing rights of way to

---

[6]    If that was not the case, then either the mineral interest retained by Union Pacific would be commercially worthless, because it could not be efficiently exploited or the cost of exploitation would be indeterminate and thus subject to independent negotiation  with each surface owner, making mineral extraction difficult and expensive.

mining locations, for operating mines and prospect sites, for laying roads, and for installing other means of removing minerals and equipment. A fair reading of these two clauses is that the former simply grants Union Pacific the right to enter onto the land when its purpose is to conduct the actual act of mining. The latter grants Union Pacific additional rights to "use" the land to accomplish tasks related to the mining process itself – establishing rights of way for access to mine sites; for laying roads, conveyors, pipelines, and other means to convey minerals (and waste products) away from the mine; for conducting the mining itself, and for occupying such additional land around a mine site as might be necessary for the regular operation of the mine (*e.g.* waste pits, tailings piles, etc.).

The parties' briefing here focuses on two general questions of law raised by the Court in its class certification order: whether the terms of the Union Pacific deed are ambiguous and what should be their proper construction. As to the first point – ambiguity – Anadarko argues that the terms are not ambiguous in any way and can by construed according to their ordinary dictionary meaning. The Plaintiffs argue that the term "convenient" is ambiguous, in the sense that "the question 'convenient to whom' [is not] answered." The Plaintiffs argue that a reasonable construction of the surface reservation's phrase "convenient or necessary" is that the two halves of the phrase refer to two different points of view: that "convenient" means "convenient to the Surface Owner" and "necessary" means "necessary to the mineral owner." The Plaintiffs point out that Union Pacific's past practices are consistent with such an understanding, as Union Pacific prohibited its lessees from drilling for oil and gas on the lands until an SOA had been negotiated with the surface owner to allow such drilling.

Sharpened to that point, the parties' dispute appears to concern whether the term "convenient" in the surface reservation is intended to refer to <u>Union Pacific</u>'s convenience or that

of the underlined surface owners.  The Court finds that the correct interpretation unambiguously points towards the question of convenience being viewed from Union Pacific's perspective for numerous reasons.

Most significantly, adopting the Plaintiffs' interpretation of the surface reservation would require the assumption that, when drafting the deeds, Union Pacific was intending to surrender a degree of access to the surface land that the common law already gave it.  As noted above, Union Pacific's status as holder of the mineral estate necessarily carried with it the common-law right to all "reasonable and necessary" use of the land, even without the deeds making any express surface reservation.  The deeds' reservation of Union Pacific's right to make "necessary" use of the surface estate obviously duplicates the right to make necessary use as conferred by the common law.  Thus, the question presented is whether, when reserving the right to make "convenient" use of the surface estate, Union Pacific was claiming a greater right to use the surface lands than the common law's grant of "reasonable" use already provided, or whether Union Pacific was accepting a lesser right than the common law conferred, thus granting the surface owners greater control over the mineral estate than they would otherwise have.  Common sense suggests that, in normal circumstances, a commercial entity can be expected to increase, not diminish, the value of its property.  Thus, one should assume that Union Pacific was acting in such a way as to make its mineral estate more valuable, rather than less. The Plaintiffs point to no evidence that would suggest that this is the unusual situation in which Union Pacific was intending to be unusually altruistic or favorable to surface owners – *e.g.* contemporaneous evidence of statements of charitable purpose by Union Pacific officials, evidence that the sales of the surface estates were made a higher-than-market values (due to the greater rights they

afforded surface owners), or indications that Union Pacific intended to devalue the mineral rights it retained.

A construction of the phrase "convenient" as considering only the mineral owner's point of view is entirely reasonable.  As explained in *Gerrity*, the question of whether a mineral owner's use of the surface is "convenient" to a surface owner is one of the factors that is considered at common-law.  As *Gerrity* states, "when the operations of a [mineral rights holder] would preclude or impair uses by the surface owner" – in other words, where the mineral rights holder is engaged in surface use that is inconvenient to the surface owner – it is possible that a trespass may occur.  946 P.2d at 927.  Thus, again, the interpretation of the surface reservation proposed by the Plaintiffs is something that was already contemplated by the common law, and interpreting the surface reservation in that way would render its "convenient or necessary" language superfluous.  The Plaintiffs' interpretation – that "convenience" was intended by Union Pacific to be judged from the point of view of the surface owner – is certainly clever, but apparently unprecedented:  the Plaintiffs have not cited to any situation in which a court has construed language similar to that in the surface reservation in such an unusual way.[7]  Moreover,

---

[7]    The Plaintiffs argue that *Baca Land & Cattle Co. v. Savage*, 440 F.2d 867 (10th Cir. 1971), construed a similar reservation in this way.  There, the seller conveyed land to the buyer, subject to a reservation allowing the seller the ability to conduct logging on the land, along with the right to "generally occupy so much of the surface of said premises and in such manner and with such means as may be necessary or convenient for the full enjoyment of the rights hereby reserved."   The relationship was harmonious for several years, with the logging practices used by the seller actually enhancing the value of the land to the buyer by converting it from forest to grazing land.  However, the relationship soured when the seller began clear-cutting stands of trees, leaving behind large "slash piles" that "form[ ] an impenetrable barrier to livestock and deer and . . . deprive plaintiffs of reasonable use of the land for many years."

The buyer brought suit challenging, among other things, the seller's "right to use the clear cutting method of timbering."  440 F.2d at 870.  The trial court found that the seller had the right to engage in clear cutting, but was obligated to perform certain restorative practices thereafter.  On appeal, the 10th Circuit acknowledged the general tension between the seller's right to cut and remove timber, "even though such removal involves a certain amount of injury to the land," and

such construction is somewhat implausible.  There would be little reason for Union Pacific to reserve the right to engage in surface uses that were "convenient" to the surface owner, as it would be unlikely that a surface owner would ever object to such a use.

The Court is also unconvinced that, textually, the phrase "convenient or necessary" is internally inconsistent when construed solely from Union Pacific's perspective.  Certainly, a mineral owner could take actions on the surface that are "necessary" but not "convenient," such as having to drill a particularly difficult well in a geographically-challenging portion of the surface.  And a mineral owner could conceivably devise surface uses that, while "convenient" to its purposes, are not strictly "necessary," such as deciding to run two pipelines across an area instead of just one in order to capture a fairly minor performance improvement.  Construed from Union Pacific's perspective, both components of the clause address conceivably different situations and construing the clause in that way does not cause one half of it to subsume the other.

---

the buyer's right for force the seller to "utilize timbering methods that [do not] unreasonably impair the rights of the landowner." *Id.* at 872.  The court noted the seller's argument that the reservation of rights allowed it to use such surface and means as may be "necessary and convenient," but the court found that such language gives "only the right to use such means as were reasonably suitable, giving due regard to the interest of the landowner." *Id.* at 873.  Finding that "the clear cutting method effectively bars plaintiffs from the land and results in serious fire and erosion dangers, " the court concluded that "such timbering practice constitutes an unreasonable infringement on plaintiffs' rights." *Id.*

Far from endorsing a doctrine that the "convenient" clause of a surface reservation allowing "necessary and convenient" use must be examined from the point of view of the surface owner, *Baca* merely stands for the unremarkable proposition that the rights of a mineral (or, there, timber) owner to use the surface must be balanced against the interests of the surface owner in a way that one side's actions do not unreasonably deprive the other of the value of their interest.  The court found that clear cutting was an unreasonable use of the surface not because it was simply "inconvenient" to the surface owner, but because it deprived the surface owner of all value of the affected surface land.  The "due regard" for the surface owner's interests is indistinguishable from the balancing of rights doctrine discussed in *Gerrity* or the multitude of cases that discuss how a mineral estate holder may "use" the surface but not "destroy" it.  *See Barker v. Mintz,* 215 P. 534, 535 (Colo. 1923).

The Plaintiffs place great reliance on the fact that Union Pacific subsequently entered into SOAs with surface owners.   Certainly, Union Pacific's decision to negotiate additional agreements and, more importantly, pay a royalty to the surface owner would seem to strongly support an argument that Union Pacific did not believe that the rights conveyed by the surface reservation were as expansive as Anadarko urges here.  Although this argument has some persuasive force, the record seems to reflect that Union Pacific's decision to require SOAs before lessees could drill for oil and gas was not the result of a belief that the surface reservation favored surface owners, but rather, that it was unclear whether Union Pacific's reservation of rights to exploit "minerals" extended to include resources such as oil and gas.  That issue was not settled until the Colorado Supreme Court decided *McCormick v. Union Pacific Resources Co.*, 14 P.3d 346, 348 (Colo. 2000) ("We hold that Colorado adheres to the majority rule that the deed reservation language 'other minerals' reserves oil and gas").[8]  Until then, Union Pacific appears to have occasionally faced contentions by surface owners that the surface reservation only reserved Union Pacific's right to "mine" for fixed (*i.e.* hard-rock) minerals, not to "drill" for fluidic oil and gas.  For example, Exhibit 3 to the Plaintiffs' opening brief is a 1954 letter from a Union Pacific official to other railroad executives, mentioning a suit brought against Union Pacific "to determine ownership of the <u>oil and gas</u> underlying" a parcel it had previously sold. (Emphasis added.)  The letter notes that "[i]t is, of course, the contention of the Union Pacific

---

[8]       The Plaintiffs' response brief points out that this issue was settled in Wyoming as early as 1978, but does not allege that the matter had been resolved in Colorado at any point prior to *McCormick*.  The Plaintiffs go on to point out that Anadarko continues to enter into SOAs with Wyoming landowners to the present day, suggesting that the resolution of the question of whether a mineral reservation includes oil and gas resources is not the sole reason why Anadarko ceased using SOAs in Colorado.  Because property rights and oil and gas development principles can differ dramatically from state to state, this Court takes little interest in inquiring why Anadarko might desire to continue offering SOAs in Wyoming but not in Colorado.

that the reservation of 'coal and other minerals' includes oil and gas," before going on to explain

that Union Pacific resorts to SOAs to avoid disputes over its use of the surface for oil and gas

drilling purposes.[9]  This evidence suggests that Union Pacific itself was occasionally bedeviled

by the unresolved question of whether its mineral estate included rights to oil and gas, explaining

why it chose to enter into SOAs that prevented disputes over such matters.  It also explains why,

upon Anadarko's acquisition of Union Pacific's mineral interests in 2000, the same year as the

*McCormick* decision, Anadarko concluded that there was no longer any need to enter into SOAs

and pay royalties to surface owners to avoid lawsuits over whether the mineral reservation

extended to fluidic "minerals."

     Accordingly, the Court agrees with Anadarko that the terms of the surface reservation are

not ambiguous, that the terms "convenient" and "necessary" as used in that reservation are

properly interpreted according to their dictionary definitions, and that the notion of whether a

given surface use is "convenient" is a determination that is made (after the *prima facie* stage, at

least) from Anadarko's point of view, not from the point of view of a surface owner.  At the

same time, the Court does not understand Anadarko's ability to engage in surface uses that are

"convenient" to it to somehow overcome *Gerrity*'s requirement that surface uses be

"reasonable."  Thus, the Court attempts to fit its understanding of the unambiguous language of

the surface reservation into *Gerrity*'s allocation of proof for trespass claims.  First, *Gerrity*

requires a plaintiff surface owner to establish a *prima facie* case by showing that the mineral

owner's use of the surface was unreasonable according to the surface owner's subjective

expectations.  The burden then shifts to the mineral owner to show that its use was both

---

[9]    Union Pacific inquires of the other railroads about their policy "with respect to securing or requiring the consent of the surface owner in situations where the railroad proposes to issue an oil and gas lease covering lands which it has previously sold with a reservation of the minerals." (Emphasis added.)

necessary to the act of exploiting the mineral estate and was reasonable according to established industry practices. This Court sees no reason why the terms of the surface reservation would upset the burden of proof at this *prima facie* stage: although Anadarko may be entitled to occupy the surface at its convenience, the Court is not prepared to say that it is permitted to act in a commercially unreasonable manner in doing so.

That leaves the last stage described by *Gerrity*: the surface owner attempting to show that there were reasonable alternatives that the mineral owner could have used but did not. It is logical that, at this stage of the analysis, Anadarko's right to act at its convenience becomes meaningful. Ordinarily, *Gerrity* would seem to suggest that the mineral owner, when faced with two or more reasonable methods for achieving a certain goal, must select the one that is least disruptive to the surface estate. 946 P.2d at 933 ("the surface owner would then be permitted to present its own rebuttal evidence that reasonable alternatives were available to the operator at the time of the alleged trespass"). Here, the effect of the "convenient" clause of the surface reservation would be honored by granting <u>Anadarko</u> the right to decide which reasonable alternative it will select, even if one alternative will result in greater surface disruption than the other. Such a construction honors the apparent intention of Union Pacific's surface reservation (to claim something more than the common law already provided the owner of the mineral estate), honors the plain meaning of the term "convenient" by allowing Anadarko to choose the alternative that it deems most suitable in a given situation, yet also honors the Plaintiffs' residual rights as surface owners and ensures that the Plaintiffs remain protected against surface uses that, although convenient to Anadarko, are nevertheless commercially unreasonable or contrary to accepted industry practices.

Accordingly, the Court construes the surface reservation on the terms set forth above.

### C.  COGCC preemption

The Court initially perceived Anadarko's opposition to the motion for class certification to suggest that, as a matter of law, the issuance of a COGCC permit to a lessee to drill a particular well would preclude any suit against the lessee for trespass, so long as it complied with the terms of the permit.  In other words, the Court understood Anadarko to suggest that COGCC regulatory process operated to preempt any subsequent tort claims based on approved wells, thereby forcing the Plaintiffs to raise their concerns about potential trespasses to the COGCC as part of the permit approval process.

Having reviewed the parties' briefing, the Court understands that this is not actually Anadarko's position.  Anadarko merely argues that compliance with the COGCC regulatory scheme could constitute evidence that a given well was "proper" in certain respects (and *vice versa*: that a well drilled without a COGCC permit would be improper, and thus a *per se* trespass), but would not, of itself, preempt a trespass claim.  Because Anadarko is not arguing that, as a matter of law, COGCC compliance would preclude any trespass action against it or its lessees, the Court need not consider this question further.

### D.  Anadarko's liability for alleged trespasses by lessees

Finally, the Court turns to the question of whether Anadarko, the only named Defendant in this action, can be held liable for trespasses on the Plaintiffs' property that are committed by non-party entities that have leased the right to exploit Anadarko's mineral estates beneath the Plaintiffs' property from Anadarko.  Anadarko's opening brief states that it "generally does not develop its oil and gas mineral interests itself"; rather, the actual physical intrusion onto the Plaintiffs' land is performed by "operators that have . . . leased the oil and gas estate from Anadarko."  Anadarko further contends, without significant dispute by the Plaintiffs, that it does

18

not directly supervise or monitor its lessee's planning or activity.  Thus, at least as to the drilling

that is performed on the Plaintiffs' lands by lessees of Anadarko, the initial question that must be

considered is whether Anadarko can be held liable for any alleged trespass committed by those

lessees.

In a prior order (# 92) in this case, this Court explained that "[g]enerally, a lessee is not

considered to be the agent of the lessor and, therefore, the lessor is not ordinarily liable for a

trespass committed by his or her lessee."  *Citing Orphan Belle Min. & Mill. Co. v. Pinto Min.*

*Co.*, 85 P. 323, 324 (Colo. 1906).  However, the Court acknowledged two situations in which the

lessor would be liable for such a trespass committed by its lessee: (i) where the lessor "aids,

abets, encourages, or authorizes the lessee in the commission of the trespass," *citing Engler v.*

*Hatch*, 472 P.2d 680 (Colo.App. 1970), or (ii) where the lessor, although unaware of the trespass

as it is occurring, subsequently "ratifies" that trespass in some way, *citing Zobel v. Fannie*

*Rawlings Mining Co.*, 111 P. 843-844-45 (Colo. 1910).   Both sides appear to agree with this

general statement of the law.

The Plaintiffs contend that Anadarko ratified the trespasses by its lessees.  Ratification, as

a theory of lessor liability, arises almost entirely from the *Zobel* case.  There, an entity called

Fanny Rawlings owned a mining claim, and Zobel owned an adjacent claim.  Zobel leased his

rights in his claim to an individual named Ostrom. Ostrom trespassed onto the Fanny Rawlings

claim and removed minerals.  The case proceeded to a jury trial, and the jury found a verdict in

favor of Fanny Rawlings and against Zobel.  On Zobel's appeal, one of the questions presented

was whether Zobel, as lessor, could be held liable for the trespass of Ostrom.  The court found

that Zobel was properly liable for "all of the trespasses, not only those of which [Zobel]

confessedly was cognizant at the time they were committed, but also those which he did not

know of at the time, but of whose perpetration he later had full knowledge, were ratified by him in knowingly accepting the fruits thereof, and that they were committed for his use and benefit, and he actually received and appropriated their proceeds to his own use."  111 P. at 844.

As discussed at some length in the Court's prior order, *Zobel* is a curious case.  The Colorado Supreme Court does not elaborate on its use of the term "ratified" (a term that usually applies when one deliberately or purposefully adopts the act of another as one's own), and the peculiar factual scenario of *Zobel* (*i.e.* the defendant's continued retention of the minerals suggesting that the case was one of not just trespass, but also conversion) calls its applicability to the instant case into some question.  Until this proceeding, it does not appear that any court in Colorado or elsewhere had cited *Zobel* or further interpreted its "ratification" doctrine in other circumstances.

Nevertheless, this Court is bound by rulings of the Colorado Supreme Court on matters of state law, and thus, in the absence of precedent repudiating it, this Court will attempt to apply *Zobel*'s teaching.  *Zobel* seems to suggest that all that is necessary for a ratification to occur is for a lessor to "accept[ ] the fruits" of the trespass after obtaining "full knowledge" of the lessee's tortious action.  Here, the tortious action is trespass – that is, the lessee making a use of the surface estate that is either unnecessary or unreasonable.  To hold Anadarko responsible for such a trespass under a ratification theory, the Plaintiffs would have to show that Anadarko knew that the lessee had made a surface use that was unnecessary or unreasonable and that Anadarko thereafter received proceeds from the lessee arising from that surface use.

The Plaintiffs attempt to argue that the Court can make a categorical ruling that Anadarko possesses knowledge of any trespass by its lessees because lessees specify where they wish to drill when seeking certain waivers from Anadarko, and that well locations are matters of public

record on the COGCC website.  Thus, the Plaintiffs contend, Anadarko could correlate various sources of information to determine when a lessee drills more than one vertical well per quarter section of land.  This argument has at least two flaws: first, it assumes the conclusion that the Plaintiffs have yet to argue and establish: that multiple vertical wells in a quarter section of land are, by definition, unreasonable or unnecessary.[10]  Second, it charges Anadarko with <u>constructive</u> notice of the trespass, which seems to be something less than the "full knowledge" that *Zobel* appears to require.  Beyond these observations, the Court is not inclined to offer a categorical pronouncement that Anadarko can always/never be liable for its lessees' trespasses under a ratification theory.  The doctrine appears to be a factually-intensive one that will require individual proof in each case in which the Plaintiffs intend to invoke it.

Turning to the "aiding and abetting" theory, that theory is derived from *Engler* and provides that "any person who aids, abets, encourages, or authorizes another in the commission of a trespass . . . is liable equally with him who commits it."  472 P.2d 680, 682 (Colo.App. 1970); *see also Yakes v. Williams*, 270 P.2d 765, 768 (Colo. 1954).  Neither *Engler* nor any other reported case that this Court is aware of elaborates on what degree of coordination or assistance is necessary to impose such liability on a lessor.

The Plaintiffs' primary argument on this point is that Anadarko authorizes or encourages the lessees to trespass by routinely waiving a right Anadarko has in its lease agreements with the lessees, by which Anadarko is authorized to require the lessee to enter into an SOA with a

---

[10]    Although this is the central tenet of the Plaintiffs' claims, the Plaintiffs do not address the argument with particular specificity in their opening brief, and provide only brief additional argument on it in their response brief.  Given the discussion herein, the Court is not convinced that one could say that, as a matter of law, the drilling of multiple vertical wells in a quarter section of land will <u>always</u> violate the surface reservation as the Court has now construed it. There may be circumstances in which multiple vertical wells <u>could</u> be considered unreasonable or otherwise contrary to accepted industry practices, but that is a matter to be proven on an individualized basis.

surface owner before commencing drilling.  The mere fact that Anadarko <u>could</u> require its

lessees to enter into an SOA does not, of itself, amount to Anadarko aiding, abetting, authorizing,

or encouraging any trespasses that the lessees do ultimately commit.   The Plaintiffs' argument

might be more persuasive if they showed first that Anadarko was aware of the particular surface

intrusion that the lessee intended to engage it and that Anadarko recognized that such a surface

use would be unreasonable or unnecessary – thus, a trespass.  In such circumstances, Anadarko's

refusal to avail itself of machinery that it had that could have prevented the trespass – *i.e.* by

preventing the lessee's actions until the lessee obtained an SOA – might be sufficient to charge

Anadarko with aiding or authorizing the trespass.  But the contention  that the mere waiver of a

right to demand a lessee obtain an SOA, without proof of greater knowledge by Anadarko of the

lessee's intentions and their tortious nature, exceeds the limitations posed by the aiding and

abetting doctrine and begins to approach a form of strict liability.

The Plaintiffs offer two other arguments in support of the contention that Anadarko

should be held liable for trespasses committed by its lessees.  First, it argues that a "common

purpose" theory supports lessor liability.  *Citing Reynolds v. Pardee & Curtin Lumber Co.*, 310

N.E. 2d 870, 876-77 (W.Va. 1983).  There the defendant lessor leased a small patch of real estate

to the plaintiff to mine coal.  Later, the defendant leased a much larger tract to a third-party,

expressly reserving the small patch that it had already leased to the plaintiff.  Still later, the

defendant leased additional, adjacent lands to the third-party, this time making no mention of the

existing reservation of lands already leased to the plaintiff.  The third-party excavated some coal

and then subleased its interest to another; at some point, the plaintiff's coal was excavated, but

the record did not disclose which party had removed it.  When the plaintiff brought trespass

claims against all involved, the trial court dismissed the claim against the lessor on the grounds

that it could not be held liable for its lessees' trespasses.  On appeal, the Supreme Court of West

Virginia reversed.  Its brief analysis of this particular issue reads, in its entirety:

> Did the court err in directing a verdict for Pardee & Curtin [the
> lessor]; is a lessor liable for tort damages caused by his lessee and
> subsequent lessees?  We find that the trial court should have
> permitted a jury to decide the issue of Pardee & Curtin's liability.
> If the jury finds that Pardee & Curtin had knowledge of or
> acquiesced in its lessees' trespass or failed to adequately warn its
> lessees about [the plaintiff's] reservation, it can be held jointly
> accountable for the trespass on a common purpose theory.

310 S.E.2d at 876-77 (citations omitted).  By all appearances, the "common purpose" theory

articulated in *Reynolds* is simply a rephrasing of the aiding and abetting and ratification theories

theory of lessor liability recognized in Colorado.   Moreover, the Plaintiffs point to no authority

from Colorado that recognizes any distinctive version of the "common purpose" theory.

Finally, the Plaintiffs argue that Anadarko should be held liable for lessees' trespasses

under an "anticipated trespass" theory.  It does not explain this theory with any particular clarity,

stating merely that "[a]nticipatory trespass theory imposes on a future trespasser the duty to stop

the continuance of the trespass."  *Citing* McCormick, *Damages for Anticipated Injury to Land*,

37 Harv. L. Rev. 574, 577-78 (1924).  The Plaintiffs do not identify any circumstance in which

the courts of Colorado have recognized such a claim,[11] much less explain how such a claim

---

[11]     The Plaintiffs cite to *Clay Spring Cattle Co. v. Bassett,* 233 P. 156, 157 (Colo. 1925), for
the proposition that "the Colorado Supreme Court has recognized the theory of anticipatory
trespass but has yet to have sufficient facts . . . causing it reason to apply such theory."  In *Clay*,
the plaintiff, a holder of superior water rights, alleged that the defendant had, on two occasions
over the past 14 years, "wrongfully encroached upon the plaintiff's rights and made diversion
through his ditches of water for his own use."  *Id.*  The plaintiff brought suit (apparently in a
statutory irrigation proceeding) "upon the assumption that the defendant hereafter will be guilty
of similar offenses."  *Id.*  The court, somewhat perplexed, stated "we confess that we do not
appreciate the force of the argument."  *Id.*  It noted that the plaintiff had a remedy in damages for
the past trespasses and could obtain relief for any future trespasses, but "to convert the
proceeding into an action . . for injunctive relief for some past or anticipated trespass cannot be
permitted."  *Id.*

would allow for the imposition of lessor liability on Anadarko for trespasses committed by its lessees. Accordingly, the Court declines to entertain the notion that Anadarko could be categorically held liable for the trespasses of its lessees on such an underdeveloped theory.

## CONCLUSION

For the foregoing reasons, the Court treats the parties' briefing as a motion for summary judgment by Anadarko and grants it in part and denies it in part.  The Court finds that the surface reservation is not ambiguous and is properly construed as set forth above.  The Court finds that compliance with the COGCC permitting process does not preempt claims by the Plaintiffs for trespass (and the Court does not opine as to the evidentiary significance that a COGCC permit might have).  And the Court finds that Anadarko may be liable for its lessees' trespasses in certain circumstances depending on factual proof, thus denying Anadarko's contention that, as a matter of law, it cannot be held liable for such acts.

Having addressed what the Court believes are the only questions of law common to all class members, it appears that the case is now ripe for decertification of the class.  Within 14 days of the date of this order, either party may show cause as to whether there are remaining questions of law that can be addressed on a classwide basis or show why the Court should not proceed to decertify the class as set forth in the certification order.  The Court expects that, upon decertification, the Plaintiffs will be given 30-60 days to indicate which surface owners (if any)

intend to proceed with individual claims against Anadarko for trespass, and, upon such notice, the Court will determine what further proceedings are necessary to address the individual claims.

Dated this 22nd day of July, 2015.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge