**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

**Civil Action No. 09-cv-02293-MSK-MJW**

**A-W LAND CO., LLC;
VERNON JESSER;
MARY JESSER;
KENT J. McDANIEL;
DEANNA R. McDANIEL;
MARVIN BAY; and
MILDRED BAY**, Co-Trustees of the Bay Family Trust, individually and on behalf of all others similarly situated,

     Plaintiffs,

v.

**ANADARKO E&P COMPANY LP f/k/a RME PETROLEUM COMPANY; and
ANADARKO LAND CORPORATION f/k/a RME LAND CORP.,**

     Defendants.

_____

**OPINION AND ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to the parties' Motions for Summary Judgment **(# 368, 369)**, their various supporting exhibits, and the parties' responses **(# 377, 378)** to each others' motions.

## FACTS

In an Opinion and Order dated July 22, 2015 **(# 303)**, this Court previously evaluated and addressed several legal arguments raised by the parties. Later, after the parties represented that there were additional, as-yet-undeveloped factual issues that could bear on the Court's analysis of the legal issues, the Court vacated **(# 316)** that Opinion. The parties then completed discovery and filed the instant briefs, again addressing the pertinent legal issues. Based on this Court's

1

review of the parties' current motions, many of their arguments are largely unchanged, and thus, much of the Court's prior analysis remains applicable. As such, the Court reaffirms and incorporates the analysis and conclusions from its July 22, 2015 Opinion herein, and elaborates in this Opinion only as needed to address newly-presented factual or legal arguments. Thus, the reader's familiarity with that July 22, 2015 Opinion is assumed.

In summary, the Plaintiffs represent a class of owners of surface lands found within the Wattenberg oil fields of northeastern Colorado. The members of the class trace their ownership of the surface lands to deeds issued by the Union Pacific Railroad Company ("Union Pacific") during the first two decades of the 20th century. Union Pacific was granted title to the lands in question by Congress to facilitate the building of the transcontinental railroad. Having completed that task, Union Pacific was then authorized to dispose of its land holdings as it saw fit.

Between 1901 and 1918, Union Pacific sold surface estates in the lands at issue here to the Plaintiffs' progenitors. Each of the deeds in question in this case reserved the mineral estates beneath those lands to Union Pacific. The "surface reservation" language in the deeds stated:

> [The sale of the land e]xcept[ed] and reserv[ed] to said Union Pacific Railroad Company, its successors, and assigns:
>
> First, all [oil,][1] coal, and other minerals within or underlying said lands.
>
> Second, the exclusive right to prospect in and upon said land for [oil,] coal, and other minerals therein . . . . [and]
>
> Third, the right of ingress, egress, and regress upon said land to prospect for, mine and remove any and all such [oil,] coal or other minerals, and the right to use so much of said land as may be

---

[1] As explained in detail in the July 22, 2015 Opinion, not all deeds expressly retained an interest in oil, gas, or other fluid minerals. However, Colorado law finds that a surface reservation that fails to mention fluidic minerals is nevertheless understood to encompass them.

> convenient or necessary for the right-of-way to and from such prospect places or mines, and for the convenient and proper operation of such prospect places, mines, and for roads and approaches thereto or for removal therefrom of [oil,] coal, mineral, machinery, or other material.

In the years following the lands transfer, Union Pacific sought to exploit its reserved mineral rights. It typically negotiated a "Surface Owner's Agreement" ("SOA") with the owner of the surface estate.  The SOA customarily acknowledged Union Pacific's ownership of the underlying minerals (including oil) and confirmed Union Pacific's right of access across the surface estate in order to remove the minerals or oil.  In consideration for the surface owner entering into the SOA, Union Pacific typically offered the surface owner a royalty payment, usually 2.5% of the value of the minerals extracted.

In or about 2000, the Defendants (collectively "Anadarko") acquired Union Pacific's mineral interests under the lands owned by the Plaintiffs.  Around the same time, the Colorado Supreme Court decided *McCormick v. Union Pacific Resources Co.*, 14 P.3d 346, 348 (Colo. 2000) in which it held that the surface reservation language used by Union Pacific reserved fluidic minerals, even where the deeds failed to expressly state as much.  The *McCormick* ruling conclusively resolved the question of whether oil and gas development on the land fell within the terms of the reservation.  Believing that this ruling resolved its the potential for disputes over its land use, Anadarko decided to discontinue the practice of negotiating a SOA with surface owners.  It also discontinued the associated practice of paying royalties to surface owners.

As a result, the Plaintiffs commenced this suit.   They allege that Anadarko's (and, more specifically, Anadarko's lessees') use of the surface of the Plaintiffs' land in order to access the subsurface minerals exceeds the scope of the surface reservations found in the underlying deeds.

They contend such actions constitute trespass under Colorado law, entitling them to various economic and declaratory relief.

Upon the Plaintiffs' motion for certification of a class action, this Court determined **(# 120)** that the claims of all putative class members presented certain common questions of law, specifically: (i) how the terms of the surface reservation in the Union Pacific deeds should be interpreted; (ii) whether Anadarko itself can be held liable for any trespasses on the Plaintiffs' land committed by its lessees; and (iii) whether permits issued by the Colorado Oil and Gas Conservation Commission ("COGCC") operate to license conduct by Anadarko or its lessees that might otherwise be in violation of the terms of the surface reservation. The parties have now had the opportunity to conduct discovery relating to these issues, and both sides move for summary judgment with regard to the first two questions.[2]

## ANALYSIS

### A. Interpretation of the surface reservation

The Court begins with the question of how the surface reservation should be interpreted. In its prior Opinion, the Court explained the basis for its conclusion that the reservation's "convenient or necessary" language was to be construed from the mineral estate holder's point of view. In doing so, the Court rejected the argument urged by the Plaintiffs, both there and here, that he phrase "convenient or necessary" should be understood to mean "convenient <u>to the surface owner</u> or necessary <u>to the mineral owner</u>."

As the Court noted in its prior Order, a reservation in a deed is construed in the same manner as a contract would be, with the same ultimate goal - to ascertain the parties' mutual intent. *Notch Mountain Corp. v. Elliott*, 898 P.2d 550, 557 (Colo. 1995). If the language is

---

[2] The parties agree that COGCC permits would not be understood to legitimize conduct that would otherwise constitute a trespass, and thus, the Court no longer considers that question.

4

unambiguous, the Court determines the intent from the four corners of the agreement, giving the words plain and ordinary meanings. *Id.*; *Copper Mountain, Inc. v. Industrial Systems, Inc.*, 208 P.3d 692, 697 (Colo. 2009). The Court considers the deed as a whole, not words or phrases in isolation, and avoids any construction that would render a provision meaningless. *Copper Mountain*, 208 P.3d at 697. Matters of contract or deed interpretation present questions of law to be resolved by the Court. *Id.* at 696.

The Plaintiffs' first argument is that an impermissible redundancy occurs if both of the terms "convenient" and "necessary" are viewed from Union Pacific's point of view. The Plaintiffs argue that any use that is "convenient" to Union Pacific would also be "necessary" to it, such that construing both terms of the phrase "convenient or necessary" from Union Pacific's perspective would make one or the other redundant.

The Court addressed a very similar argument in its prior Opinion, and its reasoning has not changed. There the Plaintiffs argued that the "convenient or necessary" phrase, if construed solely from Union Pacific's perspective, would be "internally inconsistent." July 22, 2015 Opinion at 13. As explained in the prior Order, "a mineral owner could take actions on the surface that are 'necessary' but not 'convenient,'" and might contemplate "uses that, while 'convenient,' are not strictly 'necessary,' such as deciding to run two pipelines across an area instead of just one in order to capture a failure minor performance improvement." *Id.* Thus, "convenient or necessary" allows Union Pacific to engage in actions that are necessary to the exploitation of the mineral estate, convenient for such purposes, or both.

Next, the Plaintiffs make a related argument: that the term "convenient" in the phrase "convenient or necessary" must be read in harmony with the deeds' subsequent use of that same word in the separate phrase "convenient and proper." This argument springs from the

5

unremarkable premise that when parties use the same term in multiple places in a contract, each use of that term should be afforded the same definition. *See e.g. State Farm Mut. Auto Ins. Co. v. Stein*, 940 P.2d 384, 492 (Colo.1997) (Vollack, C.J. dissenting). The Plaintiffs then reason that "convenient" must, in both contexts, be viewed from the surface owner's perspective: "if 'convenient' were to be construed from the mineral owner's perspective, the word 'proper' would be superfluous because that which is convenient would subsume that which is proper."

The Court is again unpersuaded. The surface reservation entitles Union Pacific to make as much use of the surface land as is necessary for "convenient and proper" operation of its mines or wells. The phrase "convenient and proper" modifies the subsequent phrase "operation of such prospect places, mines, and for roads and approaches thereto or for removal therefrom of [oil,] coal, mineral, machinery, or other material." Arguably, there may be circumstances where Union Pacific's construction of something like a road across the surface could constitute a "convenience" to the land owner, but there are no conceivable circumstances where the "operation of . . . mines" or the "removal of oil [or] coal" from the surface is going to be "convenient" to the surface owner; such acts will always be detrimental, to some degree, of the surface owners' intended use of the land. Instead, "convenient" means the same in both contexts – convenient to Union Pacific's operations. It is distinguished from "proper" in the sense that the former is a subjective assessment, whereas the latter approaches an objective one: the operation of a mine or well is "proper" when it accords with industry standards or government regulations. It may be "convenient" for Union Pacific to operate in a way that is nevertheless improper – *e.g.* by cutting corners or ignoring standards – just as Union Pacific might eschew an action that is "proper" because it is inconvenient. The "convenient and proper" formulation captures both concepts, allowing Union Pacific to operate its mines or wells in a manner most

convenient to it, but assuring the landowner that such operation will nevertheless also be in accordance with applicable industry standards or regulations. Thus, there is no inconsistency in finding that the first term in the phrases "convenient or necessary" and "convenient and proper" both refer to the convenience of the mineral owner.[3]

The remainder of the Plaintiffs' current argument on this point relies upon extrinsic evidence of the parties' intentions. As noted above, when the subject language can be interpreted unambiguously simply by examining its plain and ordinary meaning, the Court does not look beyond the four corners of the document itself, and thus, does not consider extrinsic evidence of that intent. *Copper Mountain*, 208 P.3d at 697. Because the Court finds no ambiguity in the surface reservation for the reasons stated above, the Court need not reach the Plaintiffs' arguments relying upon extrinsic evidence.

The Plaintiffs argue, however, that the Court may still consider extrinsic evidence for the purpose of determining whether an ambiguity exists in the first place. *Gol TV, Inc. v. Echo Star Satellite Corp.,* 692 F.3d 1052, 1055 (10th Cir. 2012). Thus, the Court pauses briefly to examine whether the extrinsic evidence proffered by the Plaintiffs suggests that the term "convenient or necessary" had, at the time of drafting, a customary or circumstantial use that would make its meaning more ambiguous than it presently appears.

---

[3] Indeed, carrying this argument to its logical conclusion reveals the fundamental flaw in the Plaintiffs' argument. One can reasonably assume that if Union Pacific proposed to make use of the surface estate in a way that was actually convenient to the landowner, the landowner would gladly consent to that use. In such circumstances, there would be no need for the term "convenient" in the surface reservation at all. A reservation of rights is necessary to ensure that one party will be able to do ab act over another party's objection. If there is likely to be no objection to a proposed use, there is no reason to have a term in the surface reservation that provides for such use. Thus, the Plaintiffs' proposed construction of the surface reservation would render the term "convenient [to the surface owner]" entirely unnecessary.

The Plaintiffs first point to the report of their expert, Thomas Andrews, a professor of Environmental History. Mr. Andrews' report explains the historical context of Union Pacific's sale of its surface lands and the importance of such sales to its cashflow; the fact that subsurface coal deposits, not fluidic minerals, were the predominant reason that mineral estates would be reserved; and the fact that coal extraction typically involved large amounts of surface disruption, potentially disrupting entirely the farming and grazing activities that constituted the primary use that surface owners made of their land.[4]  Based on these facts, Mr. Andrews opines that "landowners would have required a limit on the scope of surface use involved in mineral development and would therefore have intended that the word 'convenient' in the phrase 'convenient and necessary' to mean convenient only to the landowner." Mr. Andrews also opines that Union Pacific must have shared that intention, as otherwise, its talented legal counsel would have used more specific phraseology.[5]

Giving due deference to Mr. Andrews' considerable credentials and thorough historical recitation, the Court cannot say that his observations demonstrate an ambiguity in the surface reservation's use of the term "convenient." Contractual language does become ambiguous simply

---

[4]     Mr. Andrews also notes that buyers of surface estates tended to be unsophisticated farmers and ranchers, whereas Union Pacific retained experienced lawyers to draft the deed language. Although one would normally assume that such facts lead to the conclusion that Union Pacific would be expected to favor its own interests in its deed, Mr. Andrews appears to reason in the opposite direction. He explains that, to allay the concerns of these unsophisticated buyers, who might not buy the land if there was a risk that their farms or ranches would later be disrupted by mineral extraction activities, Union Pacific was compelled by circumstance to include a term in the surface reservation that ensured that landowners would only have to permit intrusions on the land that were convenient to <u>them</u>.

[5]     Mr. Andrews' rebuttal reports adds the observation that Union Pacific entered into SOAs with landowners until the 1950s, ostensibly for the purpose of avoiding disputes over whether its occupation of the surface estate would be deemed "excessive." Mr. Andrews suggests that this practice further demonstrates Union Pacific's understanding that it was constrained to those surface uses that were "convenient" to the surface owner.

because the parties can articulate different meanings they ascribe to it; to be ambiguous, the language must be <u>fairly susceptible</u> to multiple meanings. *East Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005).  Here, Mr. Andrews' opinion is essentially that Union Pacific intended that its use of the surface estate to exploit minerals would be limited to: (i) circumstances where it was "necessary" from Union Pacific's perspective to do so, or (ii) circumstances where it was "convenient" to the surface owner for Union Pacific to do so.  This, Mr. Andrews explains is derived from economic conditions during which Union Pacific was interested in making money from mining coal located beneath the lands which it had sold. Without purporting to weigh Mr. Andrews' opinion, the Court cannot conclude that the phrase "convenient or necessary" is fairly susceptible to multiple meanings – particularly that ascribed to it by Mr. Andrews.

If Union Pacific's objective was to reserve the right to mine for coal, there is no plausible reason why it would constrain its ability to do so to subject to the "convenience" of the surface owner.  Although it is undisputed that Union Pacific always retained the right to make surface uses that were "necessary" for mineral extraction, one would expect that it would frequently run into situations where it would be convenient, but not strictly necessary, to occupy additional portions of the surface.  Allowing the surface owner, not Union Pacific, to make the determination as to whether such additional use was "convenient" or not essentially grants the surface owner veto power over Union Pacific's decisionmaking, substantially reducing the value of Union Pacific's mineral interests.   The interpretation urged by the Plaintiffs is thus implausible, and Mr. Andrews' proffer of an opinion that leads to an illogical and commercially-unreasonable result does not suffice to demonstrate any ambiguity in the phrase "convenient or necessary."

For similar reasons, the Plaintiffs' reliance upon extrinsic evidence of Union Pacific historically entering into various SOAs in or about the time frame when it was issuing the deeds fails to demonstrate that the phrase "convenient or necessary" is ambiguous. Without needing to summarize significant historical evidence, it is sufficient to observe that Union Pacific frequently proposed such SOAs – agreements by which Union Pacific paid royalties to surface owners in exchange for non-interference with its exploitation of its mineral rights -- with the stated intention that such agreements might "protect[ it] against any claim which might be asserted by the owner of the surface rights" and "avoid a dispute as to what surface uses are permissible [and] what uses would or might be considered excessive." Accepting these facts as true, they do not refute the notion that the "convenient and necessary" reservation can only be properly viewed entirely from Union Pacific's point of view. To be sure, there is a stark difference between <u>having</u> a legal right to do something and <u>enforcing</u> that right. The legal right to pass over another's piece of land is of little solace when a fence (or a neighbor with a shotgun) blocks the way. One might eventually secure the right to peaceful transit, but doing so may take time, money, and aggravation before that right is fully and finally declared by a court. Union Pacific's decision to pay royalties to landowners reflects little more than Union Pacific's willingness to "pay for peace" in advance, rather than having to sue or be sued by surface owners in order to enforce the rights the surface reservation gave it.

The Court concedes that the argument that Union Pacific's longstanding practice of entering into (theoretically unnecessary) SOAs is somewhat more probative of there being an ambiguity in the phrase "convenient or necessary" that the other extrinsic evidence the Plaintiffs rely upon. But even if the Court were to accept that such evidence drives right up to the precipice of ambiguity, the Court remains left with the difficulty described above: there is simply

no logical explanation as to why Union Pacific would need or want to reserve a right to enter onto the surface estate to perform acts that the surface owner would consider "convenient" to him- or herself. By contrast, it is abundantly clear why Union Pacific would want to reserve the right to enter onto the surface estate when it was convenient <u>to Union Pacific</u> to do so, even if the surface owner objected. Thus, the Court is once again left with the situation where only one interpretation of the surface reservation yields a logical, meaningful outcome. Accordingly, the Court cannot say the surface reservation language is ambiguous. *Gol TV, Inc.*, 692 F.3d at1055 ("an interpretation that makes the contract or agreement fair and reasonable will be preferred to one which leads to a harsh or unreasonable result").

Finally, the Plaintiffs make an extensive argument that the Court should resort to the doctrine of *contra proferentem* – that the Court should construe the terms of the surface reservation against the drafter of them, Union Pacific. Although recognized in Colorado, the rule of *contra proferentem* is "the last rule to be resorted to, and never to be applied except when other rules of interpretation fail." *West Ridge Group, LLC v. First Trust Co. of Onaga*, 414 Fed.Appx. 112, 123 (10th Cir. 2011). Here, ordinary principles of contract interpretation produce an interpretation of the surface agreement that is entirely logical and reasonable given the circumstances. It is, to be sure, not the outcome that the Plaintiffs prefer, but it is the only reasonable construction supported by the language and circumstances of the deeds.

Accordingly, the Court finds that the phrase "convenient or necessary" in the surface reservation is to be construed from the perspective of the owner of the mineral estate only. The Court's July 22, 2015 Opinion elaborates to some degree on how that interpretation will operate in practice, and the Court deems that explanation incorporated herein.

    **B. Vicarious Liability**

The Court's July 22, 2015 Opinion addresses, at some length, the question of whether the Defendants can be held liable for any trespasses that its lessees may have committed upon the Plaintiffs' lands. The Court concluded that Anadarko could be held liable for trespasses where it "accepts the fruits of the trespass after obtaining full knowledge of the lessee's tortious action," but declined to make a "categorical ruling" that the Defendants <u>always</u> possess such knowledge due to the availability of public records and other reports detailing drilling locations. Instead, the Court explained, the matter was "a factually-intensive one that will require individual proof in each case." The Court also considered, without squarely rejecting, the possibility that the Plaintiffs could hold the Defendants liable for its lessees' actions under an aiding and abetting theory.

In the current briefing, the Plaintiffs make a lengthy, primarily factual argument apparently seeking to have the Court make the categorical pronouncement it refused to make previously. Although the record is certainly more developed this time around, the Court remains convinced that the matter is one that is not amenable to resolution on summary judgment. There remain disputes of fact as to what particular items of information the Defendants had <u>actual</u> knowledge of, and which matters they knew <u>constructively</u> (as well as those matters as to which there is a dispute of fact over whether the Defendants knew of them at all). These matters will have to await presentation at trial, although the Court will treat the parties' briefing on this point as trial briefs, apprising the Court of the parties' relative positions as to what they believe the evidence will show.

## **CONCLUSION**

For the foregoing reasons, the Court **DENIES** both parties' Motions for Summary Judgment **(# 368, 369)** to the extent that those motions seek the entry of judgment in favor of

either party on any of the Plaintiffs' claims.  The matter will proceed to trial, albeit under the legal principles set forth herein and in the Court's July 22, 2015 Opinion.

As noted in the prior Opinion, resolution of the issues of law terminates those proceedings that are capable of resolution on a classwide basis.  Accordingly, the Court dissolves the class at this time, with the various Plaintiffs proceeding to individual trials on liability and damages.  Within 14 days of this Order, the Plaintiffs shall file a listing of those individual class members who, in light of the principles set forward above, wish to pursue individual trials of their claims in this case.  However, it may be most efficient for the parties to agree upon a single bellweather Plaintiff whose claims will be tried first.  The outcome of such a case may assist the parties in reaching a resolution of the claims of the remaining Plaintiffs.  Accordingly, the Court will direct the parties to select an appropriate Plaintiff for the first trial, to begin preparation of a Proposed Pretrial Order (*see Docket* # 136) in anticipation of trial of that Plaintiff's claims, and jointly contact the Court to schedule a Pretrial Conference to set that Plaintiff's claims for trial.

Dated this 16th day of March, 2017.

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Chief United States District Judge