IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-02293-MSK-MJW

A-W LAND CO., LLC;
VERNON JESSER;
MARY JESSER;
KENT J. McDANIEL;
DEANNA R. McDANIEL; and
MARVIN BAY and MILDRED BAY, Co-Trustees of the Bay Family Trust,

    Plaintiffs,

v.

ANADARKO E&P COMPANY LP f/k/a RME PETROLEUM COMPANY; and
ANADARKO LAND CORPORATION f/k/a RME LAND CORP.,

    Defendants.

---

**OPINION AND ORDER REGARDING ADMISSIBILITY OF RULE 702 OPINIONS**

---

**THIS MATTER** comes before the Court pursuant to the parties' Joint Motion for Rule 702 Hearing (**# 413**), and the parties' evidentiary presentation and arguments at a Rule 702 Hearing conducted on September 19, 2017.

## BACKGROUND

For purposes of the instant motion, the Plaintiffs are Marvin and Mildred Bay ("the Bays"). They are the owners of the surface estate in of two parcels of land in Weld County, Colorado, described as the "North Farm" and "South Farm." The Bays use the property primarily for agricultural purposes, although they also have a residence on the property.

1

The Defendants ("Anadarko") hold the subsurface mineral estate underlying the property. Between 2006 and 2011, Anadarko[1] drilled a total of seven vertical gas wells on the Bays' property and installed roads, flow lines, and other appurtenances on the property in furtherance of those wells. The Bays acknowledge that Anadarko's possession of the mineral estate gives it some right to occupy the surface estate with the wells and associated structures, and concede that Anadarko was within its rights to drill two wells. But they contend that, by choosing to drill seven vertical wells instead of two multi-directional horizontal wells, Anadarko exceeded the scope of its rights to reasonably occupy the surface estate. As a consequence, the Bays allege that five of Anadarko's wells (and associated structures) trespass on the property under Colorado law. The Bays' claim will be proceeding to trial before a jury later this month.

Consonant with this Court's instructions, the parties raised objections to certain anticipated expert testimony under Fed. R. Evid. 702 by means of a joint motion (**# 413**). In that motion, Anadarko challenged the adequacy of the foundation for 6 opinions as to the calculation of damages proffered by the Bays' expert witness, Charles Hegarty. The Bays objected to the sufficiency of the foundation for 3 opinions proffered by Anadarko's damages expert, David Hall.[2]

On September 19, 2017, the Court held an evidentiary hearing on the Rule 702 motion. Before receiving evidence, the Court had colloquy with counsel about the issues to be addressed. They indicated that they wished to make argument and have the Court consider caselaw as to the

---

[1] At the Rule 702 hearing, Anadarko was careful to emphasize that it was its lessees, not itself, that engaged in any trespasses on the Bays land. The Court is cognizant of Anadarko's position on this issue, but in the interests of convenience for this Order, the Court will refer to Anadarko as the party engaging in the use of the Bays' land.

[2] Although Anadarko challenged the foundation for 2 opinions of Philip Goiran, the Bays' expert on oil and gas practices, the opinions and objections have been withdrawn.

appropriate measure of loss/damages in Colorado. This, the Court understood to raise a question of law -- ultimately how the jury would be instructed as to the measure of loss and calculation of a damage award for which the parties had submitted conflicting proposed instructions. The Court reasoned that the legal standard specifying how losses are measured and damages are calculated for trespass could impact whether a proffered opinion is relevant under Rule 702 as well as Rules 401 and 403. Thus, although the 702 Motion, itself, did not address relevance challenges, the Court advised the parties that relevance under Rule 702 as well as Rules 401 and 403 would be considered and the parties presented arguments as to both issues.

On Anadarko's challenge to Mr. Hegarty's opinions, the Bays called Mr. Hegarty to testify, and Anadarko cross-examined him, but neither the Bays nor Anadarko presented any other witness or evidence with regard to the challenges made. As to the Bays' challenge to Mr. Hall, Anadarko presented Mr. Hall's testimony and the Bays' counsel cross-examined him, but again neither side presented any other evidence as to the challenge.

Having now heard the evidence and considered the governing law, the Court rules as follows.

## ANALYSIS

A.   Rule 702

Fed. R. Evid. 702 prescribes four foundational requirements for the admission of expert opinions: that the expert have sufficient qualifications to render the opinion, that the expert employ reliable principles and methodologies to formulate the opinion, that the expert obtain sufficient facts and data, and that the expert reliably apply the methodology to the facts and data. At a Rule 702 hearing, the proponent of expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *See United States v.*

*Nacchio*, 555 F.3d 1234 (10th Cir. 2009); *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970 n.4 (10th Cir. 2001); *Daubert v. Merrell Dow Pharma.,* 509 U.S. 579, 592 n.10 (1993); Fed. R. Evid. 702 advisory committee's note. The proponent of the opinion need not prove that the expert is undisputably correct, only that the conclusion reached by the witness is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements. *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781 (10th Cir. 1999). Thus, the Court's focus is generally not on the precise conclusions reached by the expert, but instead upon the expert's qualifications, information relied upon and the methodology employed in reaching those conclusions. *See Daubert,* 509 U.S. at 595; *see also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

Generally speaking, a successful Rule 702 challenge requires the party asserting it – the party opposing the admission of the opinion – to support the challenge with evidence obtained from someone other than the challenged expert. This is because few proffered experts will take the stand and admit, even under the most withering of cross-examination, that their methodologies are unreliable, that they are not qualified to render the opinion offered, that they did not reliably follow the methodology that they endorse, or that they did not consider the sufficient facts and data. Usually, it is necessary for the opponent of the opinion to call its own witness to establish, for example, that the proponent's methodology is not generally recognized in the field, that it has inherent flaws, that it was not properly applied, etc.[3]

---

[3] This Court has often used a baking analogy to explain Rule 702's principles: to assess whether a cake has been baked, we examine whether the person doing the baking is a person who knows how to bake (qualifications), whether the recipe used is one that is generally known to produce a cake (methodology), whether the baker gathered the correct amounts of the required ingredients (sufficient facts and data), and whether the baker actually followed the recipe's instructions (reliable application). If those four criteria are satisfied, we can fairly assume that

4

Here, neither side called a witness to contradict the other sides' proffered expert's testimony, leaving assertions by the witness offering the opinion unrebutted. Because the party who objected to the foundation of particular opinions offered no evidence, the preponderance of the evidence (indeed the only evidence) is found in the testimony of the witness who offered the opinion. As to all but one of the proffered opinions, the preponderance of the evidence supports a finding of adequate foundation, and consequently the objections are overruled.

Nevertheless, to the extent more detailed factual findings are necessary, the Court finds as follows:

• Mr. Hegarty's Opinion 1 was: "The value of the Plaintiff's properties as of July 21, 2017 is $11,000 per acre or $2,954,000." The objection was that Mr. Hegarty did not reliably apply an otherwise reliable methodology. Mr. Hegarty derived this opinion be performing a typical real estate appraisal, based on 5 comparable sales. Although there was cross-examination as to differences between the parcels reflected in the comparable sales and the Bays' property, the only evidence as to what adjustments should have been made to account for such differences came from Mr. Hegarty, who claimed that he made all appropriate adjustments. There was no evidence from a witness skilled in application of the comparable sale methodology that Mr. Hegarty had not applied it correctly. As a result, the objection is overruled. This does not mean that the critique apparent in the cross-examination would not be appropriate if the opinion were admitted at trial, but in that context it goes to weight, not admissibility.

• Mr. Hegarty's Opinion 2 was: "Based on the estimated value of a temporary easement over the entirety of the Plaintiff's properties, the resulting loss is $1,440,000." The objections were that the opinion was not based on sufficient facts and data and the opinion was not a product of a reliable methodology. The temporary easement calculation was one of three methodologies used by Mr. Hegarty to quantify the Bays' loss of use of property as a measure of damages. Mr. Hegarty testified that he used this methodology because it was akin to what he

---

the end product is a cake, and at trial it is up to the factfinder to decide whether the cake is attractive or tasty, (what weight to give the opinion).
  Extending that analogy to the question of how an opponent might challenge the opinion, assume that the baker has testified that he made his cake by pouring a fruit filling onto a pastry crust and baking it. The opponent of that opinion vigorously cross-examines the baker about to establish that such technique produces a pie, rather than a cake. Questions of counsel are not evidence. *See e.g. U.S. v. Dixon*, 38 Fed.Appx. 543, 549 (10th Cir. 2002). If the baker adheres to his position that he produced a cake, absent evidence to the contrary, the opponent cannot shift the preponderance of evidence to result in a determination that the baker baked a pie. Instead, the opponent must call its own baker who testifies that what was produced was a pie, not a cake.

used in inverse condemnation cases – to reflect the value of the Bays not being able to use their land due to the presence of 5 wells and support structures. Mr. Hegarty's contention that the use of an inverse condemnation model was an appropriate one to use in this case was unrebutted. There is, at least conceptually, similarities between the instant case and inverse condemnation cases, such that the Court cannot say that an inverse condemnation valuation model is fundamentally inappropriate here. Although Anadarko had criticisms of certain findings and assumptions Mr. Hegarty made in implementing the model, those criticisms go to the weight that the factfinder should give that opinion, not to its admissibility. As to Anadarko's challenge to sufficiency of facts and data, that objection refers to a <u>quantum</u> of facts, not the quality of facts. *See U.S. v. Lauder*, 409 F3d 1254, 1264 n.5 (10th Cir 2005). Anadarko presented no evidence of how many facts should be considered in applying an inverse condemnation model. Thus, both objections are overruled.

• Mr. Hegarty's Opinion 3 was: "Based on the amount operators pay to landowners for permission to construct horizontal drilling pads and related production facilities, the resulting loss is $554,750." This was Mr. Hegarty's second method for quantifying the Bays' loss of use due to the 5 trespassing wells. The challenges were lack of a reliable methodology and insufficient facts and data. With regard to this methodology, Mr. Hegarty chose approximately 22 acres as the affected property, based on having walked the property, observing structures created by Anadarko, and taking measurements. He called upon his knowledge of what other oil and gas developers paid to other landowners in the region. And he used a series of calculations to convert those payments to a per-acre value that he applied to his computation of the affected area here. As with the prior opinions, cross examination was vigorous focusing on the viability of horizontal drilling, the improper inclusion of both permitted and trespassing wells and the like, but no evidence was presented that the use of a comparable rental rate was not a reliable methodology nor that there was an amount of facts and data that should have been considered but was not. Accordingly, the objections are overruled.

• Mr. Hegarty's Opinion 4 was: "Applying the compensation paid by Saddlehorn Pipeline Company to the Bays for a right of way and easement for a pipeline in 2016 to the 22 impacted acres, the reasonable rental rate would be $605,000." Again the objections were insufficient facts and data and lack of a reliable methodology. Mr. Hegarty explained that he viewed the pipeline lease between the Bays and Saddlehorn, derived a per-acre value of that lease, and applied it to the 22 acres impacted by the wells. The cross-examination overlapped that for opinion #3, with the same result. Absent evidence showing that the methodology used (application of a pipeline lease rental rate to the 22 acres) was an improper methodology for quantifying loss or that some amount of facts and data should have been considered but was not, the objections are overruled.

• Mr. Hegarty's Opinion 5 was: "The area impacted or encumbered by Defendants' alleged trespass is 22.19 acres." Andarko objected as to the methodology and the sufficiency of facts and data. The Court has already addressed this opinion, as it is embedded within Mr. Hegarty's Opinions 3 and 4, and overrules Anadarko's objections for the same reasons.

• Mr. Hegarty's Opinion 6 was: "Plaintiff's total damages are $700,000 as of July 21, 2017." Anadarko objects as to methodology. Mr. Hegarty derived this opinion by taking the

three damage values produced by his three models -- $1.44 million, $554,750, and $605,000 – and attempting to reduce them to a single consensus value.  He admitted that the $700,000 figure was not a mean or a median calculation; he acknowledged that no calculation would yield that sum.  Instead, he based it on his "professional experience as an appraiser, as applied to the data that is presented in the report."  Here, the Court finds Anadarko's objections as to methodology well-taken.  Mr. Hegarty did not purport to apply any particular methodology to reach the $700,000 figure, much less one that could be reliably applied; he admitted that the figure was simply one that he felt was fair.  This is the classic "*ipse dixit*" opinion that is forbidden under Rule 702.  *General Electric Co. v. Joiner*, 522 U.S. 136, 137 (1997).  Accordingly, Mr. Hegarty's Opinion 6 is excluded due to a lack of a reliable methodology.

• There were only two Hall opinions at issue. (Hall Opinion 1 was withdrawn). Hall Opinion 2 was " Mr. Hegarty's three methods for calculation of alleged "trespass" damages are flawed, inconsistent, and result in an unreasonable estimate of potential damages."  The Court will not belabor its analysis of this opinion, as it is more in the nature of argument.

• Hall Opinion 3 was "If there is a finding of liability, reasonable damages for the Bay Plaintiffs' loss of use of the Bay properties total approximately $44,550 before offset for payments already received."  The Plaintiffs challenged this opinion only on the ground that Mr. Hall lacked the knowledge, skill, experience, training or education to express it.  Mr. Hall testified to his education, certification as a Fraud Examiner, Management Accountant and Valuation Analyst and his experience in computing economic damages over a 29 year career.  On cross-examination, he admitted that he is not a certified real estate appraiser, but there was no evidence presented that a certified appraiser was required to quantify the Bays' loss of use attributed to the 5 wells and support structures.  Furthermore, there was no evidence that Mr. Hall's qualifications were inadequate for the formulation of the opinions he proffered.  Thus, the objections are overruled.

Thus, the Court overrules the Rule 702 challenges, with the exception of Hegarty Opinion 6 which is sustained.

**B.  Relevance**

As to opinions for which no foundational challenge is sustained, the opinions are nevertheless subject to relevance challenges. First, Rule 702 requires that opinion testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *U.S. v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011).  Second, such testimony is subject to the general relevance requirements of Rules 401 and 403.  *U.S. v. Call*, 129 F.3d 1402, 1405 (10th Cir. 1997).

7

### 1. Colorado Law as to Damage Awards for Trespass

Under Colorado law, the goal of a damage award for trespass is to "reimburse that owner for the actual loss suffered" – that is "to put an injured person in a position as nearly as possible equivalent to his position prior to the tort." *Board of County Commissioners v. Slovek*, 723 P.3d 1309, 1314 (Colo. 1986); *Zwick v. Simpson*, 572 P.2d 133, 134 (Colo. 1977) ("the goal of the law of compensatory damages is reimbursement of the plaintiff for the actual loss suffered").

Colorado law recognizes three categories of loss due to trespass for which damages that may be awarded. The primary loss is the diminution of market value of the property that results from the trespass. *Slovek, id.* In certain cases, where diminution of market value cannot be calculated or it is otherwise not appropriate, courts allow an alternative measure of loss measured by the cost of restoring the property to its original, pre-trespass condition. The choice between these two primary measures is dictated by several factors, such as whether the owners' intended use of the property requires its restoration, and whether the injury to the land is repairable. *Id.*

Diminution in value or cost of repair are concerned with providing relief based on the state of the property once the trespass has <u>concluded</u>. To address losses that occur <u>during</u> the trespass, Colorado law also authorizes an award of damages to reflect the landowner's loss of use of the land. *Slovek*, 723 P.2d at 1317. Loss of use reflects "a loss of the owner's ability to receive rent or the loss of an ability to carry on an economic enterprise on the property, measured in terms of a hypothetical loss of rental value." *Id.* at 1317-18.

Finally, a plaintiff can recover for injuries in the form of annoyance and inconvenience that result from the trespass. These injuries include the distress that arises out of physical discomfort, irritation, or inconvenience caused by odors, pests, noise, and the like. *Webster v. Boone*, 992 P.2d 1183, 1185-86 (Colo. App. 1999). As an example, damages can be awarded for

the time and effort spent cleaning up a flooded basement, for the lingering smell, and for the loss of hobby activities that would otherwise have been conducted in that basement, *Id.* "Pure" emotional distress damages, however, that are not tied to any physical injury or intrusion on the land are not recoverable. *Id.*

Although the Defendants agree that in this case there can be two compensable losses (diminution in value of the property due to the trespass and loss of use during the trespass), the Bays seek only damages for loss of use of the property during the trespass. Thus the Court focuses on that form of relief.

For trespasses on agricultural lands, the loss of use is often measured by the value of crops that could not be grown during the trespass. *See* Colorado Pattern Jury Instruction 18:4, comment 9, *citing Roberts v. Lehl*, 149 P. 851 (Colo. 1915). Here, although the Bays acknowledge that the lands that Anadarko trespassed upon would otherwise have been put to agricultural uses they implicitly contend that there may be other uses from which they have been foreclosed. For example, their damage calculations include what they might have earned if the trespassed property might have been leased to horizontal drillers or used for a pipeline lease. This is akin to the measure endorsed by the Colorado Supreme Court in *Slovek*. There it explained that the "loss of use" damage measure is "normally conceived of in terms of a loss of the owner's ability to receive rent or the loss of an ability to carry on an economic enterprise on the property, measured in terms of a hypothetical loss of rental value." 723 P.2d at 1317-18. The Bays contend that *Fowler Irrevocable Trust v. City of Boulder*, 17 P.3d 797, 804 (Colo. 2001), further elucidates the *Slovek* rule, requiring consideration of "the property's highest and best use during the period" and inquiring "what rental would the property have produced" during

that period in a transaction between a willing lessor and willing lessee.[4] This Court finds that, although Colorado courts seem to suggest that trespass damages are limited to <u>actual</u> losses, cases like *Slovek* (and perhaps *Fowler*) authorize a plaintiff to measure loss of use damages by use of a hypothetical model.

Thus, in instructing the jury, the Court intends to omit any reference to a damage award for diminution in value or cost of restoration. The instruction will concern only loss of use. It will read as follows:

> If you return a verdict in favor of the Bays, you may award them damages during the time period of the trespass in the following two categories:
>
> 1) Damages for the loss of use of the property that Anadarko improperly occupied. Such damages should be measured by the use to which the Bays could have put the property had it not been occupied by Anadarko. You may consider what the Bays lost by not being able to grow crops on that land and what the Bays lost by not being able to rent such property to a third party.
>
> 2) Damages for the discomfort and annoyance that the Bays experienced as a result of Anadarko's trespass. This award should be limited to compensation for physical discomfort, irritation, or inconvenience suffered by the Bays because of dust, odors, noise, and the like that Anadarko generated from its use of the trespassed land. No award may be made for emotional distress.

---

[4] The Court has some doubt that *Fowler* provides appropriate guidance here. *Fowler* is an inverse condemnation case, not a trespass case. Although the two are superficially similar – *Fowler* involved the defendant taking over a portion of the plaintiff's land for several years to use as a construction staging area without the plaintiff's permission – there is some indication in Colorado law that a trespass action and an inverse condemnation action are fundamentally incompatible, such that one's damage rules do not apply to the other. *See Ossman v. Mountain States Telephone and Telegraph Co.*, 520 P.2d 738, 741 (Colo. 1974) (reversing trial court judgment where court "combined elements of the measure of damages of a trespass action and an inverse condemnation action in [its jury] instructions"). Nevertheless, the Court will assume that the *Fowler* and *Slovek* describe damage principles common to both types of cases, such that the former merely provides a slightly more precise explanation of the latter.

## 2. Relevance of Opinions

### a) Hegarty Opinions

With these principles in mind, the Court then turns to the relevance of Mr. Hegarty's proffered opinions. Mr. Hegarty used three methods he used to calculate the Bays' trespass damages.

First, he attempted to determine "what the compensation would be for a temporary easement" over the property. His methodology entailed determining the fair market value of the Bays' entire property, which he did by locating comparable properties in the area and adjusting the prices of their completed sales to current market rates, using those to determine what a fair market sale of the Bays' property would generate. That calculation yielded a value of $11,000 per acre. He then multiplied the property's per-acre value by a "rental rate" that Mr. Hegarty did not otherwise explain in either his testimony or report. He explained that, in his experience, he typically applies rental rates of between 8% and 10% in eminent domain cases. But here, apparently owing to the fact that Anadarko's trespasses were usually localized around discrete well pads, he applied a rental rate of 5% instead. He then multiplied the .05 rental rate by the $11,000 per acre value of the Bays property to reach an annual easement cost, then multiplied that amount by the <u>total</u> number of acres comprising the North and South Farms, then multiplied that total by the 9.8 years of the limitations period in this case. According to this "temporary easement" method, he concluded that the Bays' loss of use was approximately $1.4 million.

The Court finds that the "temporary easement model" is conceptually inconsistent with the measure of trespass damages under these facts. The parties agree that 2 of the 7 gas wells on the Bays property are permissible; 5 of the 7 wells are allegedly trespass wells and those wells were drilled at different times. In addition, they agree that the Bays land is comprised of two

parcels, one of which includes the Bays' home. One permitted well is located on each parcel, which means that each parcel has both permitted and arguably trespassing wells. Mr. Hegarty computes the acreage impacted by the well pads, roads, flow lines and production facilities at approximately 22 acres.

Colorado law allows only damages attributed to the loss of use caused by the trespass – that means the 5 trespass wells, and then only from the times that they were drilled. Mr. Hegarty's "temporary easement model" grossly exceeds the type of damages awardable. It calculates a per-acre value for the entire Bay property,[5] then multiplies the entire acreage (roughly 250 acres as compared to the 22 impacted acres) by a seemingly arbitrarily-selected "rental rate" factor. This assumes facts for which no proffer has been made - that every acre of the Bays' property has a similar value, that Anadarko wells and operations not only affected every nook and cranny of both parcels, that every part of the property was similarly affected, that all wells were drilled at the same time, and that all adverse effects were caused by the 5 trespassing wells as compared to the 2 permitted wells. The Court finds this opinion so overbroad as to make it unhelpful to the jury under Rule 702(a) and irrelevant under Rule 401. Accordingly, the Court excludes any testimony from Mr. Hegarty about this damage model.

The second method Mr. Hegarty described is based on the practice of oil and gas developers to offer to compensate the landowner with a one-time payment in exchange for all of the property damage and inconvenience that will result from the creation and maintenance of the well over its lifetime. Mr. Hegarty testified that developers typically drill multiple directional or horizontal wells from a single pad, and that the rate of compensation they offer landowners is

---

[5]     Among other things, the Court is also troubled by Mr. Hegarty averaging the value of the entire parcel evenly across the acreage, rather than acknowledging that the residential portion of the property likely amounts to a disproportionate share of the property's value (and thus producing an overweighted per-acre average value).

currently about $25,000 per well,[6] with anywhere from 6 to 10 wells being drilled per pad. Mr. Hegarty then calculated the per-acre value of such a payment (with 10 wells at $25,000 each, drilled on a 10-acre pad, yielding a value of $25,000 per acre), and multiplied that by the 22 acres he believed were affected by Anadarko's trespass, yielding a total "market-based" damage estimate of about $554,750.

This evidence is potentially relevant. Here, Mr. Hegarty appears to be assuming that if an operator is willing to pay similarly-situated landowners a certain amount for the right to drill and maintain numerous horizontal wells, the value that the Bays may have lost is similar. There is a logical congruency to this reasoning,[7] but only if there is additional testimony that explains how the drilling of horizontal wells is similar to the drilling of vertical wells (in terms of amount of land used, disruption, size and siting of necessary appurtenances, etc.), such that it would be reasonable to assume that a per-acre payment value for vertical wells would be comparable to the rate at which per-well payments are made for horizontal wells. The Court need not opine as to whether Mr. Hegarty or some other witness might be the one to provide such testimony, but it is clear that such testimony is necessary in order to elevate this damage model from potentially relevant to <u>actually</u> relevant.

Mr. Hegarty's third method compared Anadarko's use of the property to a pipeline easement that the Bays granted to an entity called Saddlehorn Pipeline Company in 2016. The easement granted Saddlehorn the right to run a pipeline across a portion of the South Farm, in

---

[6] On at least one occasion during the hearing, Mr. Hegarty instead testified that the $25,000 payment was "per pad," but it appears that he was testifying about an exception to the general rule. On balance, his testimony and report make clear that he believes the prevailing payment is made on a per-well basis.

[7] The Court has some doubt that Mr. Hegarty's conversion of per-well payments to a per-acre value is logically sound, but that matter is appropriate fodder for cross-examination. It is not so patently illogical as to require exclusion of this opinion on relevance grounds.

13

exchange for a one-time payment to the Bays of roughly $202,000. Mr. Hegarty believed that the Saddlehorn transaction was a particularly cogent indicator of the value of the Bays' loss of use of the trespassed land because it included compensation for a permanent easement similar to that created by the Anadarko trespass, it included compensation for crop damages and damage to soil of the same type that the Anadarko trespass caused, that it was negotiated by the Bays themselves, and so on. To equate the Saddlehorn easement to the Anadarko trespass, Mr. Hegarty divided the easement price by the number of acres affected by the Saddlehorn easement to determine a per-acre cost for the easement of roughly $23,000. He then multiplied that per-acre cost by the number of acres (approximately 22) he believed comprised the area trespassed on by Anadarko, yielding a total damage estimate of $605,000.

Mr. Hegarty's damage model based on the Saddlehorn pipeline is potentially relevant. The crux of this damage calculation seems to be "if Saddlehorn was willing to pay some $23,000 per acre to disrupt the surface with a pipeline, a hypothetical mineral operator [like Anadarko] might be willing to pay the same amount per acre for the right to construct well pads and appurtenances." This model has some probative value, but only if supplemented by additional evidence from a competent witness attesting that the land on which the Saddlehorn pipeline is constructed has the same geographic and economic characteristics as the land related to the 5 trespassing wells. Put differently, it may be that the Saddlehorn pipeline crossed over particularly valuable lands (say especially scenic, particularly fertile, or unusually convenient), such that the Bays were able to command a premium for that land's use. Or it may be that the lands Anadarko trespassed upon are particularly worthless (*e.g.* rocky, inconvenient, remote, etc.), such that treating them equivalently to the Saddlehorn land significantly overstates their value. Thus, while the Court finds that Mr. Hegarty's model based on the Saddlehorn lease

14

has the potential to be relevant, that relevance is conditioned upon testimony (that Mr. Hegarty did not give, but that some other witness might be able to provide) that demonstrates that the Saddlehorn lands and the trespassed lands are sufficiently similar as to warrant equivalent valuations.

Accordingly, the Court excludes as irrelevant Hegarty Opinions 1 & 2 (that are components of the excluded "temporary easement" model). As noted earlier, Hegarty Opinion 6 (arbitrarily aggregating the three models) is excluded under Rule 702 as lacking a reliable methodology. The remaining opinions are potentially relevant, subject to the Bays adducing additional evidence at trial sufficient to establish the predicate facts, discussed above, and evidence that Mr. Hegarty tacitly relied upon in formulating those models.

**b. Hall opinions**

Mr. Hall proffers 3 opinions, the first of which was withdrawn. His second opinion is: that Mr. Hegarty's "three methods for calculating alleged 'trespass damages' are flawed, inconsistent, and result in an unreasonable estimate of potential damages." This statement is nothing more than argument, and thus are not relevant evidence for a jury to consider. He may, however, testify as to specific flaws he finds in Mr. Hegarty's reasoning or calculation, if those flaws have been disclosed to the Plaintiffs.

Mr. Hall's third opinion is that the maximum damages that the Bays can prove on their trespass claim is $44,550. According to his report, he reached this calculation by noting the acreage of the Bays' property that was occupied by the contested Anadarko wells and compared it to the acreage that would have been occupied if, as the Bays suggest, Anadarko had drilled several horizontal wells from a single well pad instead. This calculation yielded an acreage difference that varied from year to year (Mr. Hall explained that well pads "shrink" over time as

drilling operations are completed and excess land is able to be reclaimed), but ranged from slightly over 5 acres to less than a single acre. He then examined various surface use agreements the Bays had entered into with other entities to determine how much money those agreements allocated paid per acre for the loss of crop land. He found that figure to be approximately $1,750 per acre per year. He multiplied that amount by the number of excess acres occasioned by Anadarko's vertical drilling, yielding a total calculation of $44,550 in crops lost to Anadarko's trespass over the period in question.

This opinion is relevant, insofar as it attempts to determine the Bays' loss of use damages using a measure recognized in the law – loss of value of crops that could have been planted on the trespassed land – and does so in a manner that has a plausible rationale. Accordingly, the Court excludes Mr. Hall's Opinions 1 and 2 as irrelevant, and allows Mr. Hall's Opinion 3 to be offered.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the parties' Joint Motion Under Rule 702 **(# 413)** as set forth herein. Of those opinions at issue, Mr. Hegarty's Opinion 6 is excluded for lack of foundation under Rule 702. His Opinions 1, and 2 and Mr. Hall's Opinion 2 are excluded as irrelevant under Fed. R. Evid. 702(a) and 401. The remaining contested opinions are admissible, subject to the presentation of the necessary supporting evidence at trial.

Dated this 20th day of September, 2017.

**BY THE COURT:**

*/s/ Marcia S. Krieger*

Marcia S. Krieger
Chief United States District Judge