IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 09-cv-02293-MSK-MJW

MARVIN BAY and MILDRED BAY, Co-Trustees of the Bay Family Trust,

      Plaintiffs,

v.

ANADARKO E&P COMPANY LP; and
ANADARKO LAND CORPORATION,

      Defendants.

_____

**OPINION AND ORDER DIRECTING BRIEFING**
_____

**THIS MATTER** comes before the Court pursuant to the instructions of the 10th Circuit Court of Appeals in *Bay v. Anadarko E&P Onshore, LLC*, 912 F.3d 1249 (10th Cir. 2018). That order vacated the judgment entered by this Court in favor of the Defendants and remanded the matter for further proceedings consistent with the court's opinion.

The Court assumes the reader's familiarity with the proceedings to date and the 10th Circuit's opinion, and the Court will not further summarize them. The Court is given pause by the 10th Circuit's discussion of the "material interference" standard, which requires the Bays to establish that the Defendants' use of the surface estate "completely precludes or substantially impairs" the Bays' ability to make use of the parcel as a whole. 912 F.3d at 1262. The surface owner must show that "surface use [is] infeasible or nearly impossible under the circumstances" created by the exploitation of the mineral estate. *Id.* at 1261. It is not sufficient for a surface owner to simply demonstrate that "inconvenience and some unquantified amount of additional expense" results from the exploitation of the mineral estate; rather, the surface owner must show

1

that it "has no reasonable alternative method to maintain the existing use" of the surrounding property once mineral exploitation begins. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 252 (Tx. 2013), *cited with approval in Bay*, 912 F.3d at 1262. Noting that this standard presents a "high bar," the 10th Circuit expressed some doubt as to whether the evidence that the Bays had adduced at trial would be sufficient to satisfy it, but it declined to reach that question because it had not been raised on appeal.

The 10th Circuit's observation presents a potential question of legal sufficiency, similar to a mid-trial motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 that would, if resolved in favor of the Defendants, ameliorate the need for a re-trial. As such, the Court believes that it is appropriate to address the issue on the record created at the September 2017 trial in this case.[1]

Marvin Bay testified about farming two plots of land, the North Farm and the South Farm, both located in Eaton, Colorado. The Bays grow sugar beets, alfalfa, corn, wheat, and beans on the parcels in question. The Bays' claims here concern gas wells that Noble Energy, the Defendants' subcontractor, drilled on the Bays' property – two on the South Farm and three on the North Farm – beginning in or around 2006. The drilling and operation of the five challenged wells has not prevented the Bays from continuing agricultural uses on both parcels, and indeed, it appears that the farms remained operational through the time of trial in 2017. In

---

[1] As the 10th Circuit's opinion acknowledges, this Court's prior rulings and the parties' proposed jury instructions recognized that the Bays had the burden of proving at trial that the surface estate was sufficiently impaired. 912 F.3d at 1262 n. 9. Thus, the Court sees no reason to reopen the record or permit the submission of evidentiary material beyond that which the Bays presented at trial for purposes of resolving the issue at this time.

explaining how the five wells in question[2] affected his farming operations, Mr. Bay identified several categories of concerns.

First, he described some degree of inconvenience that resulted from farming operations being conducted in the vicinity of the wells in question. Mr. Bay explained that when he is using farm equipment and approaches one of the well locations, "I have to stop, lift up my equipment, back up, go around the well where I can't cut any crops . . . [and] start on the other side." Mr. Bay explained that the resultant "gap" – that is, the area he is unable to farm around the well site because he had to lift his equipment – becomes "a good place for weeds to grow."

Second, he described "compaction," that is, a compacting of soil that results from oil and gas operations. Mr. Bay explained that compacted soil "will not grow very good crops," but that "as you keep farming [it], eventually it gets better and better." Mr. Bay's testimony seemed to suggest that compaction had occurred along fence lines that Noble Energy had constructed to section off its production activities, such that crops near those fence lines were less healthy than crops elsewhere on the property. Later, Mr. Bay also described a situation in which a production vehicle was driven on thawed land, resulting in compacted "wheel tracks" going out that particular well location. Mr. Bay estimated that it took five years before the affected soil could be brought back up to grade level so that it could be properly irrigated.

Third, Mr. Bay described a circumstance in which a developer – Mr. Bay's testimony was not particularly specific as to who, when, and where – failed to completely restore a mud pit, leaving a situation where a portion of the property was "real sticky." Mr. Bay stated that one of

---

[2] The Bays had previously consented to two oil and gas wells being drilled on the property, and they emphasized that their trespass claims in this case did not relate to those two wells. The Court understands Mr. Bay's testimony discussed herein to be referring to the specific incremental effects that the five challenged wells had on the property, over and above the impacts from the two unchallenged wells.

3

his center pivot sprinklers traveling over that area "would sink into that" former pit area and could not be moved. Mr. Bay stated that he tried to dig the sprinkler out but was unable to, and that as a result, he would have to "go in there with a tractor and pull the sprinkler out of the hole." Doing so would causing him to "knock[ ] all the corn down" in the area around that sprinkler.

Fourth, Mr. Bay complained that soil conditions over flow lines installed by Noble were "very soft," such that, again, irrigation equipment would sink into the soil and have to be pulled out. Mr. Bay stated that "we had to pull it out several times," and that, eventually, he decided to "put rocks and sand in the bottom of the sprinkler track." He testified that even this solution was suboptimal, because if "you knock some of the rocks out, now you've got these rocks out in your field."

Fifth, Mr. Bay indicated that Noble is "supposed to keep the weeds out" on those portions of property it occupies. He acknowledged that Noble "send[s] out somebody to spray weeds" about once a year, but that "we've got a tremendous bunch of weeds" around the well locations.

Sixth, Mr. Bay stated that the South Farm is on hillier property and that "water can get in the . . . trenches where they put down the flow lines and run down those and erode the hillside out some."

Seventh, Mr. Bay testified, somewhat unclearly, that "it wastes some water on the center pivot . . . it gets in the wrong rows and it runs off the field because of the flow lines."

Eighth, Mr. Bay complained that Noble employees driving down access roads to get to the wells "knock[ ] out the crop in about a 15-foot wide strip going out to the wells."

Ninth, Mr. Bay explained that the construction of the wells entailed "lights all time of the night" as well as noises from vehicles driving out to the well sites and as a result of other well

4

operations. Mr. Bay also testified that, during the course of well drilling, there was a "tremendous amount of diesel" exhaust fumes that was "not a pleasant thing." These were problems associated particularly with one well that were located close to the Bays' residence on the North Farm. Mr. Bay also testified that the drilling of that well caused the residence's drinking water to become clouded and sulfurous, although that problem abated over time.

Finally, Mr. Bay testified about unspecified concerns about "radiation and asbestos" on the property, based on a story that he had read about in the Denver *Post*, as well as references to those substances in an asset purchase agreement between Noble and the Defendants that Mr. Bay reviewed.

None of the impacts Mr. Bay described at trial would seem to suffice to constitute a material interference with the Bays' ability to substantially all of the remaining portions of the parcel for agricultural purposes. Indeed, it appears to be undisputed that the Bays continue to use the majority of both the North and South Farms for the same agricultural uses that they employed prior to 2006, with the exception of certain surface areas that have been appropriated by Noble for well pads, production facilities, access roads, and other related construction. Mr. Bay's testimony makes clear that he is able to continue farming close to and around the well pads, albeit with some inconvenience to the operation of farming equipment and with some limited loss in efficiency immediately around Noble's infrastructure. The record also reflects that although certain types of construction have intermittently impeded the Bays' farming operations – such as irrigation equipment getting stuck in soft soil resulting from Noble's installation of flow lines – the Bays have been able to employ reasonable alternative methods to restore their ability to meaningfully continue farming operations, such as by shoring up the soil in the sprinkler tracks with sand and rock.

Nothing that Mr. Bay described appears to rise to the level of the type of impairment found to be sufficient in *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tx. 1971), *cited with approval in Gerrity Oil & Gas Corp. v Magness*, 946 P.2d 913 (Colo. 1997) *and in Bay*, 912 F.3d at 1256. In *Getty*, the surface owner used a central pivot irrigation system with a seven-foot clearance to make agricultural use of the land. The mineral owner installed two oil wells, one 17 feet high and the other 34 feet high, essentially preventing the surface owner from making automated use of four of the six established pivot points for his irrigation system. The surface owner produced evidence that, due to a labor shortage, automatic irrigation was the only economically-viable way to make agricultural use of the land. Further, the surface owner showed that it was possible for the mineral owner to have recessed the wells such that the irrigation system could have cleared them. The Texas Supreme Court found that these facts were sufficient to create a triable question as to whether the mineral owner's actions materially interfered with the surface owner's use of the land.

By contrast, in *Merriman*, another case relied upon by the 10th Circuit, the surface owner used the land for a cattle operation, having constructed permanent fencing and corrals. The surface owner also used temporary corrals and pens during "round-up" operations. The mineral estate owner constructed a well on the property, and the surface owner contended that the well's location substantially impaired his ability to continue cattle operations. The evidence at summary judgment indicated that the surface owner had reasonable alternatives to conduct the cattle operations at the locations he had previously used. As the Texas Supreme Court explained, affirming a grant of summary judgment to the mineral owner, the surface owner "did not explain why corrals and pens could not be constructed and used somewhere else on the tract[. I]f they reasonably could be, then his existing use was not precluded." 407 S.W.2d at 251. The

court emphasized that there was evidence that the location of the well "precludes or substantially impairs the use of his existing corrals and pens, creates an inconvenience to him, and will result in some amount of additional expense and reduced profitability because . . . he will have to build new corrals or conduct his operations in more phases." *Id.* at 252.  But the court held that "evidence that the mineral lessee's operations result in inconvenience and some unquantified amount of additional expense to the surface owner does not rise to the level of evidence that the surface owner has no reasonable alternative method to maintain the existing use." *Id.*

Here, Mr. Bay's description of the effects that flow from the construction of the wells in question here appear to be the same sorts of mere inconveniences and inefficiencies as in *Merriman*, not the wholesale deprivation of his ability to make productive agricultural use of the land as in *Getty*.  As such, on the record before this Court and upon the standards announced by the 10th Circuit, this Court would be inclined to grant judgment as a matter of law to the Defendants on the element of material interference with the surface use, finding that the Bays have not come forward with sufficient evidence to carry their burden on that element.  Before doing so, however, the Court believes it appropriate to allow the Bays an opportunity to be heard on the sufficiency of the evidence in the record.

Accordingly, within 21 days of this Order, the Bays may file a brief addressing the evidence in the trial record and whatever legal authority they wish to rely upon to demonstrate their ability to establish the material interference element.  The Defendants shall have 14 days from the Bays' filing to file any response.  If the Court ultimately concludes that the Bays' evidence, taken in the light most favorable to them, is sufficient for a *prima facie* showing, it will begin the process of

setting this matter for a new trial; if not, the Court will enter judgment on behalf of the Defendants.

Dated this 28th day of May, 2019.

**BY THE COURT:**

_____

Marcia S. Krieger
Senior United States District Judge